## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

NAVISTAR, INC.                                    )
4201 Winfield Road                                )
Warrenville, Illinois 60555,                      )
                                                  )
      Plaintiff,                            )
                                                  )
           v.                    )    Civil Action No. _____
                                                  )
LISA P. JACKSON, Administrator,                   )
United States Environmental Protection Agency     )
Office of the Administrator                        )
1200 Pennsylvania Avenue, N.W.                     )
Washington, D.C. 20460                             )
                                                  )
      and                                  )
                                                  )
UNITED STATES ENVIRONMENTAL                       )
PROTECTION AGENCY                                 )
Office of the Administrator                        )
1200 Pennsylvania Avenue, N.W.                     )
Washington, D.C. 20460,                            )
                                                  )
      Defendants.                          )
                                                  )

## COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF TO REQUIRE THE EXERCISE OF NON-DISCRETIONARY DUTY TO RECALL NON-CONFORMING HEAVY-DUTY DIESEL ENGINES UNDER THE CLEAN AIR ACT

Plaintiff Navistar, Inc. ("Navistar"), by its attorneys and for its Complaint for

Declaratory and Injunctive Relief against Defendants the United States Environmental

Protection Agency and Lisa P. Jackson, in her official capacity as Administrator of the United

States Environmental Protection Agency (collectively, "EPA"), alleges as follows:

### NATURE OF THE ACTION

1.      This is a civil action under Section 304(a)(2) of the Clean Air Act ("CAA"),

42 U.S.C. § 7604(a)(2), to compel the Administrator to perform non-discretionary acts and

duties required of her by Congress under the CAA.  In particular, the Administrator has failed

to perform certain non-discretionary acts and duties required by CAA § 207(c)(1), 42 U.S.C.

§ 7541(c)(1), with respect to certified, model year ("MY") 2010 heavy-duty diesel engines equipped with liquid, urea-based selective catalyst reduction ("SCR") technology.[1]

2.      Under CAA § 207(c)(1), 42 U.S.C. § 7541(c)(1), the Administrator "*shall require*" the recall and repair of any class or category of engines that "do not conform to the regulations prescribed under section 7521 [CAA § 202] . . . when in actual use throughout their useful life."[2] As alleged in detail below, MY 2010 SCR engines are being operated in violation of their EPA-issued certificates of conformity, in violation of EPA's maintenance requirements, and otherwise "do not conform to the regulations prescribed under section 7521 . . . when in actual use throughout their useful life." As a result, the Administrator has a non-discretionary duty to recall such engines and require that the non-conformities in theses engines be repaired.

3.      Specifically, for MY 2010, EPA certified as compliant with the CAA and its regulations, SCR-equipped, heavy-duty diesel engines that are programmed to run for certain periods without diesel exhaust fluid (the urea-based fluid necessary for the system to work, "DEF"), with the wrong fluid (*e.g.*, water), with frozen fluid, or with the SCR system disconnected (and, thus, with **zero** SCR-control of oxides of nitrogen ("NOx") emissions during those disabled conditions).

4.      In doing so, EPA authorized SCR-equipped engine NOx pollution, but EPA purported to limit such pollution by requiring SCR-engine manufacturers to program their MY 2010 engines with mile/hour **limits** for driving with the SCR system disabled. EPA stated that the drivability of these engines would degrade severely "*to a point unacceptable for typical driving*" and thereby, according to EPA, force the operator to take the vehicle off

---

[1]      "SCR-equipped engine" or "SCR engine" herein refers to liquid, urea-based SCR heavy-duty diesel engines and vehicles.

[2]      Emphasis in quotes is indicated by bold and italicized typeface.  Unless otherwise indicated, all such emphasis is supplied by Navistar.

the road until its SCR system is fixed. Revised Guidance for Certification of Heavy-Duty

Diesel Engines Using Selective Catalyst Reduction (SCR) Technologies, at 5 (Dec., 30,

2009) ("December 2009 Guidance") (Ex. G hereto). EPA calls the drivability degrade

"driver inducements." *Id.*

5.      However, in reality on the highway, EPA's "driver inducements" to force the

vehicle off the road are either not present, or ineffective, or both, as conclusively

demonstrated through independent testing of a random sample of EPA-certified, MY 2010

SCR-equipped engines. The independent testing showed that all or a substantial number of

EPA-certified, MY 2010 SCR engines are in fact designed and programmed to run for

lengthy periods, or indefinitely, without the certified "inducements" being triggered and,

therefore, without drivability being degraded in the manner certified by EPA.

6.      First, the independent testing demonstrated that, even when proper DEF is

used, the SCR system simply does not turn on in low engine exhaust temperature conditions

such as experienced during urban driving or congested traffic. That is because DEF is urea-

based, and in order for NOx reduction to occur, the urea first needs to be converted to

ammonia. That only occurs when the engine exhaust temperature is very high. In congested

traffic or stop-and-go driving, heavy-duty diesel engine exhaust operating temperatures are

frequently too low for the urea-to-ammonia conversion to occur.

7.      Second, during a driving test when all DEF was consumed, the testing showed

that ordinary tap water could be substituted for DEF and that any "inducement" triggered for

the empty DEF tank could be easily cleared and normal driving resumed. Extended testing

with water not only showed that the "inducements" are **not** triggered by using water instead

of DEF, but also that no damage to the engine or the emission control system was detected.

3

8.    Third, the independent testing demonstrated that when the DEF is consumed and the DEF tank is dry, the "inducements" necessary to force the vehicle off the road were not triggered.

9.    Fourth, the independent testing showed that liquid, urea-based SCR systems are easily disconnected on the road.

10.   Fifth, the independent testing measured the emissions from these engines when ordinary tap water was substituted for DEF, when vehicle operation continued on an empty DEF tank, and when the SCR system was disconnected.  The measurements showed that NOx tailpipe emissions were **3-40 times higher** than when the SCR system was operating as intended.

11.   Finally, the independent testing showed that when water was substituted for DEF or when the system was otherwise disabled, every engine failed "*not to exceed*" ("NTE") regulatory emission requirements, 40 C.F.R. § 86.007-11(a)(4), to which these engines must be, and supposedly are, certified.

12.   The results of these tests were provided to EPA.

13.   The Administrator has determined, pursuant to CAA § 207(c)(1), 42 U.S.C. § 7541(c)(1), that a substantial number of MY 2010 SCR-equipped engines are not designed consistent with their certificates of conformity, do not meet maintenance requirements, or otherwise "do not conform to the regulations prescribed under section 7521 [CAA § 202] . . . when in actual use throughout their useful life."

14.   For example, the Administrator knows that the independent testing proved that SCR-equipped trucks operating on tap water, rather than the necessary DEF, run that way indefinitely.  One test vehicle was driven over 14,000 miles on water and another over 20,000 miles.  Each vehicle would have continued to operate with tap water, but the testing was terminated because it was pointless to continue to run the engines to prove what was obvious

– namely, the SCR emission control system easily could be bypassed with water, eliminating the cost and inconvenience of filling up with DEF. When the engine runs with water in the urea tank, NOx control from the SCR system is reduced to **zero** and, in such circumstances, NOx emissions could **not** meet the EPA emission standards.

15.    EPA's certification requirements for SCR-equipped engines authorize the use of water or improper fluid for extended, but not unlimited, periods of time. As such, EPA has authorized the certification of engines programmed to use water in place of DEF, leaving no question that the use of water instead of DEF is not improper "maintenance." However, the Administrator did not certify SCR-equipped engines that, in production, are programmed without limits on the use of water allowing them to be driven for their entire 15-20 year life cycle with the SCR system disabled and, thus, with no SCR-NOx control.

16.    Moreover, the Administrator did not certify SCR-equipped engines to be programmed, in production, to eliminate or bypass the required "inducements" by using water or in any other way. And yet, MY 2010 SCR engines manufactured and sold into commerce are defectively programmed in violation of their EPA certifications, because they are designed and built to run on the highway without SCR-NOx emission control in direct violation of the conditions governing their EPA certifications and the CAA.

17.    As such, MY 2010 SCR engines are being manufactured, sold and operated illegally because they are in open violation of the certificates of conformity issued for them by EPA.

18.    This action seeks (a) a declaration that the Administrator has failed to exercise her non-discretionary duty to require the recall and repair of MY 2010, SCR-equipped engines, (b) an order for the Administrator to exercise that duty, and (c) attorneys fees and other litigation costs. Under these circumstances, Congress mandated that the Administrator

5

has no discretion but "*shall require*" SCR-engine manufacturers to recall and remedy the

nonconformities in their engines.  CAA §207(c)(1), 42 U.S.C. § 7541(c)(1).

## THE PARTIES

19.     Plaintiff NAVISTAR, INC. (f/k/a International Truck & Engine Company) is

a company incorporated under the laws of Delaware, with its headquarters and principal place

of business located in Warrenville, Illinois.  Navistar is a leading manufacturer and marketer

of mid-range and heavy-duty diesel engines, medium-duty diesel trucks, heavy-duty diesel

trucks, and severe service vehicles.  For the reasons stated herein, the Administrator's failure

to perform her non-discretionary duty under CAA § 207(c)(1), 42 U.S.C. § 7541(c)(1), causes

Navistar injury for which it has no adequate remedy at law.

20.     Defendant LISA P. JACKSON is the Administrator of the United States

Environmental Protection Agency, and is sued in her official capacity.  Ms. Jackson is

ultimately responsible for ensuring that EPA complies with and fully implements the CAA.

21.     Defendant UNITED STATES ENVIRONMENTAL PROTECTION

AGENCY is the federal agency charged with implementation of the CAA.

## JURISDICTION AND VENUE

22.     This Court has jurisdiction over this action pursuant to CAA § 304(a)(2),

42 U.S.C. § 7604(a)(2), as well as 28 U.S.C. §§ 1331 and 1361.  This Court may issue a

declaratory judgment and grant further relief pursuant to CAA § 304(a)(2), 42 U.S.C.

§ 7604(a)(2), and 28 U.S.C. §§ 2201 and 2202.

23.     Venue for this action lies in this judicial district pursuant to CAA § 304, 42

U.S.C. § 7604, and 28 U.S.C. § 1391(e) because the Administrator and EPA reside in this

federal district.

24.     CAA § 304(b)(2), 42 U.S.C. § 7604(b)(2), requires that sixty (60) days written notice be provided to the Administrator prior to commencement of a citizen suit action for the Administrator's failure to perform a non-discretionary act or duty.

25.     Pursuant to CAA § 304(b)(2), 42 U.S.C. § 7604(b)(2), and 40 CFR part 54, Navistar notified the Administrator by certified mail on February 9, 2011, of Navistar's intent to file suit for her failure to perform her non-discretionary recall duty under CAA § 207(c)(1), 42 U.S.C. § 7541(c)(1). A true and correct copy of this notice is attached hereto as Exhibit A and is incorporated herein.

26.     On March 8, 2011, EPA acknowledged receipt of Navistar's notice (Ex. B hereto) but has not otherwise responded nor taken action to remedy the Administrator's failure to exercise her non-discretionary recall duty.

27.     The sixty-day notice period expired on April 10, 2011.

### LEGAL AND FACTUAL BACKGROUND

28.     In 2001, EPA promulgated a new NOx emission standard for heavy-duty diesel engines of 0.20 grams per brake-horsepower-hour, which became fully effective in MY 2010 (the "0.20 g NOx Standard"). *See* Control of Air Pollution from New Motor Vehicles: Heavy-Duty Engine and Vehicle Standards and Highway Diesel Fuel Sulfur Control Requirements, 66 Fed. Reg. 5002 (Jan. 18, 2001) (the "2001 Rule") (excerpts attached as Ex. C hereto).

29.     EPA said the stringent standard was necessary because NOx contributes to "premature mortality, aggravation of respiratory and cardiovascular disease, . . . changes in lung function and increased respiratory symptoms, changes to lung tissues and structures, altered respiratory defense mechanisms, chronic bronchitis, and decreased lung function." *Id.* at 5006. EPA also said that without the reduction, an appreciable number of areas containing a substantial proportion of the population would violate ozone standards. *See id.* at 5015.

7

30. CAA §202(a)(3), 42 U.S.C. § 7521(a)(3), requires that new NOx emission standards "reflect the greatest degree of emission reduction achievable through the application of technology which the Administrator determines will be available for the model year to which such standards apply." With respect to the 0.20 g NOx Standard, EPA found that liquid, urea-based SCR technology did not provide "an adequate basis for establishing the feasibility of today's [0.20 g NOx] emission standards." 2001 Rule at 5053.

31. EPA expressly recognized that "[u]nlike all other major emission control devices, SCR systems require regular user interaction to ensure the system is operating properly." Certification Procedure for Light-Duty and Heavy-Duty Diesel Vehicles and Heavy-Duty Diesel Engines Using Selective Catalyst Reduction (SCR) Technologies, at 5 (Mar. 27, 2007) ("2007 Guidance") (Ex. D hereto).

32. When the SCR tank does not contain DEF, or contains improper DEF, or when DEF is frozen, or when the system becomes disconnected, EPA said "the efficiency of the SCR catalyst drops to *zero* and NOx emissions can increase substantially." *Id.* at 1. EPA also said that "if you don't add urea, you're out of compliance." M. Osenga, *EPA Announces SCR Compliance Guidelines: Agency Gets Very Specific In Telling Manufacturers, "OK, Use SCR, But . . .",* Diesel Progress North American Edition (May 2007) (quoting Margo Oge, Director of the EPA Office of Transportation and Air Quality) (Ex. E hereto).

33. EPA concluded that liquid, urea-based SCR is driver-dependent and that the driver has a strong incentive "not to refill the urea tank." 2001 Rule at 5053. Accordingly, when EPA decided to allow the use of liquid, urea-based SCR emission controls systems, EPA stated that SCR-equipped engines would have to be programmed so that they "*never operate*" without SCR functioning. 2007 Guidance at 3. According to EPA, if the engines were programmed to operate without SCR functioning, it would be impossible to achieve the benefit of the 0.20 g NOx Standard on the road. *See id.* at 3-4; *see also* 2001 Rule at 5053.

8

34.     As a result, EPA stated it would require certification testing of a SCR engine **without DEF** but said it might not if "the manufacturer can prove to EPA that their SCR system design *will not run out of [DEF] in-use* and thus not exceed the emission standards[.]" 2007 Guidance at 4. EPA said, in the later case, that it would be necessary to develop "inducements" sufficient to "ensure" that "drivers will *not operate* the vehicle with empty reducing agent tanks." *Id.*

35.     EPA concluded that "if the vehicle exceeds emissions standards without reducing agent in the tank . . . *the design will be considered unacceptable.*" *Id.* EPA also stated that "*it is critical* that a vehicle using SCR *never operate* without the reducing agent." *Id.* at 3.

### A.     EPA's MY 2010 SCR "Certification Requirements"

36.     On February 18, 2009, EPA revised its 2007 Guidance, issuing its "Certification Requirements for Heavy-Duty Diesel Engines Using Selective Catalyst Reduction (SCR) Technologies" (the "February 2009 Guidance") (attached as Ex. F hereto). EPA announced it would certify MY 2010 SCR-equipped engines that are programmed to continue driving with the SCR system **not** operating, but with required "driver inducements" – comprised of a series of warning lights and slowing of the engine called gradual power derates – EPA concluded would force operators to take the vehicle out of service and fix the condition responsible for the SCR system being inoperable. February 2009 Guidance at 2-3.

37.     EPA stated it would certify heavy-duty SCR-equipped vehicles to operate for a limited number of miles or hours with incorrect DEF (*e.g.*, with water only), or "poor quality DEF" (*e.g.*, diluted with water), or a disconnected system, or frozen DEF, or an empty DEF tank (*i.e.*, no fluid), after which the vehicle must become "unacceptable for typical driving" upon some refueling, parking, or restarting trigger event. *Id.* at 3.

9

38.     In its February 2009 Guidance, EPA did not authorize any engine operation when the SCR system is suppose to be functioning but is not turned on.  But EPA knows, as independent testing has shown, that liquid, urea-based SCR systems do not function when they are supposedly operational in some circumstances, such as in environmentally sensitive urban-traffic or congested-traffic conditions.

39.     On December 30, 2009, EPA purported to revise again its SCR "certification requirements" and issued additional "guidance" – namely, the December 2009 Guidance.

40.     EPA did not change its substantive decision to limit SCR-equipped vehicle operation with the SCR system disabled.  EPA also continued to employ the same "driver inducements."  *See* December 2009 Guidance at 5.

41.     In its December 2009 Guidance, EPA also did not authorize unlimited operation, or operation beyond what is authorized by its certifications, when the SCR system does not function as intended during conditions such as those experienced during urban driving or congested traffic.

42.     At the request of SCR engine manufacturers, EPA also authorized SCR engine makers to install very small urea tanks, requiring frequent and expensive replenishment of DEF to accommodate the marketing objectives of those engine manufacturers rather than any environmental purpose or any real technological constraint.  *See* Control of Emissions from New Highway Vehicles and Engines: Approval of New Scheduled Maintenance for Selective Catalyst Reduction Technologies, 74 Fed. Reg. 57,671 (Nov. 9, 2009) (Ex. H hereto).  The use of ultra-small urea tanks necessitates the nuisance and expense of frequent DEF replenishment, which EPA recognized as a condition that creates a disincentive for drivers and raises the risk that the maintenance (*i.e.*, DEF replenishment) will not occur.  *See, e.g.*, 2001 Rule at 5053.

43.     EPA purported to neutralize the incentive to avoid DEF replenishment – that EPA itself created by its authorization of the use of ultra-small urea tanks – on the assurance that "inducements" were programmed into the engines and that such "inducements" would be effective enough to make the vehicle **undriveable** when DEF is not replenished. *See* 74 Fed. Reg. at 57,674.

44.     EPA's authorization of ultra-small capacity DEF tanks was made under EPA's existing "allowable maintenance" regulations, 40 C.F.R. §§ 86.004-25, 094-25. Under those regulations, EPA requires manufacturers to design the longest maintenance interval (*i.e.*, here expressed as the capacity of the DEF tank) "technologically necessary," and which has "a reasonable likelihood of being performed in-use." 40 C.F.R. §§ 86.094-25(b)(2), (b)(6)(ii). EPA's stated purpose in doing so is that the less frequent the maintenance interval, the more likely the maintenance will be performed, and the more frequent the maintenance interval, the less likely the necessary maintenance – here, DEF replenishment – will occur.

45.     In short, compliance with the letter and spirit of the "allowable maintenance" regulations is necessary "to assure in-use compliance with the emission standards." 74 Fed. Reg. at 57,672; *see also* 44 Fed. Reg. 9464, 9468 (Feb. 13, 1979) (restricting maintenance is "necessary to help insure that in-use emissions do not exceed the standards due to manufacturers using emission control technology which require extensive maintenance and then not having such maintenance performed").

46.     Based on information and belief, EPA has turned a willful blind-eye to these environmentally hostile operating conditions, the results of the independent testing, the violation of its own regulations and the CAA, and, most notably, the violations of the certificates of conformity it issued to the SCR engine makers because it was "captured" by the SCR engine makers' lobbying. As a result, agency officials made serious regulatory blunders that they would rather cover-up than admit and fix.

**B.    MY 2010 SCR Engines Are Certified With EPA's Mileage/Hour Limits And "Inducements"**

47.    Based on information and belief, EPA issued MY 2010 certificates of conformity for SCR-equipped heavy-duty engines that were represented to EPA as being programmed with the mileage/hour limits and "inducement" requirements consistent with the 2009 "guidances" and the SCR "allowable maintenance" interval.

48.    Based on information and belief, EPA did not certify indefinite operation with the SCR system disabled.

49.    Based on information and belief, EPA did not certify engine programming or design that eliminates or bypasses the required "inducements."

**C.    Independent Testing Demonstrates MY 2010 SCR-Equipped Engines Do Not Operate As Certified**

50.    Independent consultants, EnSIGHT, Inc., tested MY 2010 SCR-equipped heavy-duty vehicles to determine whether EPA's "driver inducements" actually cause a non-conforming vehicle to be taken off the highway and to determine whether SCR engines were effective in low engine exhaust temperature conditions. *See* EnSIGHT, Inc., *On-Road Emission and Inducement Testing: An Evaluation of On-Road NOx Emission Control by SCR in 2010 Certified Diesel Trucks* (Aug. 20, 2010) ("EnSIGHT Report") (Ex. I hereto); *see also* EnSIGHT, Inc., *On-Road Emission and Inducement Testing: Supplemental Testing and Evaluation of On-Road NOx Emission Control by SCR in 2010 Certified Diesel Trucks* (Oct. 2010) ("Supplemental EnSIGHT Report") (Ex. J hereto).

51.    EnSIGHT arranged, designed, and managed the testing, including supervising and controlling the drivers, route selection, test equipment, test procedures, data logging, data collection and analysis. The testing itself was performed by the same testing experts used by EPA. *See* EnSIGHT Report at III(a).

52.     Three trucks were tested: (1) Freightliner Cascadia with Detroit Diesel 15-liter engine; (2) Kenworth T-660 with a 15-liter Cummins Model ISX 15 435B engine; and (3) Dodge Ram 5500 crew cab flatbed with a Cummins 6.7-liter Model ISB6.7 305 engine. *See id.* at III(c). The trucks were tested on-highway using portable emission measurement systems. *See id.* at II(c).

53.     The trucks were driven by professional drivers in either California (Freightliner, Dodge) or Indiana (Kenworth), in both "urban" and "highway"/"high speed" driving cycles, and under loaded and unloaded conditions. *See id.* at III(e), (f). There was no test track, no special driving instructions, and real world routes typically driven by trucks were utilized. *See id.* at III(f).

54.     Tests were representative of the engine families the three trucks represent and the entire SCR-equipped 2010 heavy-duty diesel fleet. *See id.* at I, V.

55.     EnSIGHT found that every MY 2010 SCR truck highway-tested was fully drivable for indefinite periods with an empty DEF tank, or with water instead of DEF, and/or with the DEF dosing valve disconnected. EPA's mile/hour limits and power derate "driver inducements" either were not triggered or did not work at all, or, if they did, they worked erratically at best. As EPA knows, the "inducements" certified by EPA for MY 2010 are not designed or programmed into the engines or do not function.

56.     EnSIGHT also found that every SCR system on every SCR truck highway-tested did not turn on when it was supposed to (and, based on information and belief, as represented it would in certification applications submitted to EPA) during low engine exhaust temperature conditions such as experienced in urban driving and congested traffic. For instance, the NOx emissions the Freightliner 15L emitted were, on average, more than **9 times higher** in low temperature conditions experienced in urban driving as compared to high-speed, highway driving. *See EnSIGHT Report, at IV(a).*

57. Moreover, each of the trucks tested emitted significantly greater levels of NOx when the SCR system was not functioning properly. The highest – the Kenworth 15L – emitted NOx up to **40 times higher** without DEF, and even the "least" polluting truck – the Dodge 5500 – emitted NOx 3 to 4 times higher on the highway without DEF. And, all the tested trucks failed NTE regulatory requirements in their SCR-disabled states. *See id.*

58. Actual in-use testing has shown that MY 2010 SCR-equipped trucks are programmed to run their entire 15-20 year life cycle with SCR turned off, which they do when the DEF tank is empty, or when the DEF tank contains water rather than DEF, or when the system is simply unplugged. *See id.*

59. The results of EnSIGHT's tests have been provided to EPA. Navistar incorporates by reference herein EnSIGHT's independent testing reports and the results reflected therein, which are attached hereto as Exhibits I and J.

60. Navistar also highlighted the problem of SCR-equipped engine operation without a functioning system and the related emission testing in a documentary film presented and made available at a July 20, 2010, public workshop on SCR that EPA held jointly with the California Air Resources Board ("CARB"). *See* DVD, *License to Pollute* (July 20, 2010) (Ex. K hereto). The film was also made available to the public on YouTube. *See* http://www.youtube.com/watch?v=BOJ1rLgEj9I&feature=mfu_in_order&list=UL (last visited April 21, 2011). A second film highlighting the ease of disconnecting an SCR system was submitted to EPA (along with the EnSIGHT reports) and made publicly available after the public workshop. *See* DVD, *Demonstration of Ease of Disconnecting Electrical Supply to SCR Dosing Valve* (Aug. 2010) (Ex. L hereto); *see also* http://www.disconn.com (last visited April 21, 2011).

61. The public workshop was attended by representatives of the manufacturers of the tested SCR engines. Neither EPA, CARB nor the manufacturers themselves have

contested the accuracy of the tests or the films.  Based on information and belief, none of

them has produced any test results of their own contradicting EnSIGHT's findings.  Navistar

incorporates the films by reference herein, which are attached hereto in the form of DVDs as

Exhibits K and L.

   62. EPA is aware that EnSIGHT's test results about SCR's inadequacies during

low engine exhaust temperature conditions are confirmed by European and Japanese studies

(which also have been provided to EPA) on the ineffectiveness of liquid, urea-based SCR

systems in urban environments. *See, e.g.*, N. Ligterink, et al., *On-road NOx Emissions of

Euro-V Trucks*, TNO Science and Industry, at 3 (Dec. 2, 2009) ("These new [road] estimates

of NOx emissions from trucks in common urban situations are ***three times higher*** than the

corresponding emission limit[.]") (Ex. M hereto); Ltr. fr. D. Kodjak (Int'l Council on Clean

Transp.) to M. Oge (EPA) (Aug. 20, 2010) (discussing Japanese and other urban driving

studies) (Ex. N hereto).

   63. CARB reached similar conclusions about SCR's poor NOx control

performance during low engine exhaust temperature conditions as far back as 2008. *See* S.

Hu, *et al.* (CARB), *Emissions from HD Diesel Retrofits for PM and NOx Control*, at 8 (2008)

(Ex. O hereto) (reporting "low NOX conversion during activity that yields low exhaust

temperatures (*i.e., stop-and-go driving*)").

   64. "The automotive industry acknowledges that Selective Catalytic Reduction

(SCR) systems are barely effective in urban driving conditions . . . ." Memo from General

Secretariat to Delegations of the Council of the European Union (Mar. 8, 2010) (Ex. P

hereto).

   65. In its 2007 Guidance, EPA determined that it is essential for liquid, urea-based

SCR systems to recognize the wrong fluid. *See* 2007 Guidance at 7. EPA said that "*[i]t is

also imperative that the SCR system design be able to detect incorrect reducing agent*" such

as "*filling the tank with water* rather than the specified reducing agent." *Id.* EPA also said

that "[t]he system must be able to identify and appropriately respond to a high NOx

emissions performance level associated with filling the storage tank with a fluid other than

[DEF], or with excessively diluted reducing agent." *Id.* EPA indicated that SCR engine

manufacturers could utilize either a urea sensor or a NOx sensor to do that. *See id.* ("Possible

mechanisms . . . include NOx sensors or urea sensors.").

66.     Even though EPA supplemented the 2007 Guidance in its February 2009

Guidance and then again in the December 2009 Guidance, EPA also said the 2007 Guidance

remains in effect. *See, e.g.*, December 2009 Guidance at 3. And, in the February and

December 2009 Guidances, EPA authorized the use of improper fluid (or water) by vehicle

drivers. But, in so doing, EPA required that manufactures design SCR-equipped engines to

limit operation on water to a confined period of time.

67.     As EPA is now aware, and independent testing has demonstrated, either the

necessary sensors are not installed on the tested vehicles or the sensors used are ineffective.

The NOx sensors that these tested trucks employed for MY 2010 simply do not recognize the

difference between water and DEF.

68.     And in asking "Why use a quality sensor?", at least one urea-quality sensor

supplier answered that "*industry sources indicate that up to 50% of truck drivers . . . do not

use AdBlue* [– the European Union's counterpart for DEF –] *on the SCR trucks*."

http://www.wema.com/?page=417&show=431 (last visited April 19, 2011) (emphasis in

original) (Ex. Q hereto). In fact, EPA is fully aware – and Navistar pointed it out in its

written comments to EPA's public workshop – that drivers of SCR-equipped vehicles are

actively trying to eliminate the requirement to replenish DEF, including aftermarket

companies who advertise cheap "DEF delete" kits for use in heavy-duty vehicles. *See, e.g.*,

http://www.dieselpowerproducts.com/p-5937-flopro-2011-ford-powerstroke-671-4-cat-and-

dpf-delete.aspx ("The 2011 6.7L Ford Powerstroke owners can finally stop waiting. Delete exhaust is finally available . . . . This Kit is designed to allow you to remove . . . the DEF system with the use of a tuner.") (last visited April 20, 2011) (Ex. U hereto).

69.     According to SCR engine makers, however, urea sensors will not be commercially available until at least MY 2013. After obtaining certification from EPA for their MY 2010 SCR-equipped engines, the SCR engine manufacturers admitted in their comments submitted in connection with the EPA/CARB July 2010 workshop that urea sensors are unavailable and would not be ready for use until at least MY 2013. *See, e.g.*, Aug. 20, 2010 Statement of Cummins Inc., at 9 (Ex. R hereto) ("DEF quality sensor technology is not fully developed but is expected by MY 2013."); *see also* Aug. 20, 2010 Statement of Daimler-Detroit Diesel and Volvo-Mack, at 2 (Ex. S hereto) (stating urea sensors "have historically been determined to have inadequate durability and reliability for the rigors of the heavy-duty truck market").

70.     In other words, SCR engine makers have admitted and directly informed EPA that their engines can run indefinitely on water and are in violation of the certificates of conformity issued to them by EPA for MY 2010 SCR-equipped engines as well as EPA regulations and the CAA.

   **D.     EPA's Response to MY 2010**

71.     EPA is fully aware that 100% of the randomly selected MY 2010 SCR-equipped heavy-duty vehicles have failed actual highway in-use tests, including failing to meet NTE certification requirements.

72.     EPA is fully aware that in 100% of these highway tested MY 2010 SCR-equipped vehicles and in urea-based SCR-equipped vehicles generally, the engines are defectively designed and programmed defectively to run without SCR-NOx control during low engine exhaust temperature conditions such as urban driving.

73.     EPA is fully aware that in 100% of these highway tested MY 2010 SCR-equipped vehicles, the purported "inducements" do not function in actual use as required by their certificates of conformity or the approved maintenance waiver.

74.     EPA is fully aware that in 100% of these highway tested MY 2010 SCR-equipped vehicles, the engines are defectively designed and programmed to run without the reducing agent necessary for the system's operation (*i.e.*, DEF).

75.     EPA is fully aware that in 100% of these highway tested MY 2010 SCR-equipped vehicles, the engines are defectively designed and programmed to run indefinitely with an empty DEF tank, to run indefinitely on water, and/or to run indefinitely if the system is disconnected.

76.     EPA is fully aware that in 100% of these highway tested MY 2010 SCR-equipped vehicles, the engines are defectively designed and programmed to run without a working urea or NOx sensor that detects the use of improper DEF.

77.     EPA did not certify MY 2010 SCR-equipped vehicles to operate with the SCR system disabled for indefinite periods of time.

78.     As noted above in Paragraph 60, on July 20, 2010, EPA co-sponsored a workshop on SCR with CARB. EPA agreed to reexamine their MY 2010 SCR strategy for future model years in order to settle certain petitions for review brought by Navistar in the United States Court of Appeals for the D.C. Circuit, challenging EPA's environmentally and legally defective SCR-certification requirements for SCR-equipped engines. *See* Control of Air Pollution from New Motor Vehicles: Announcement of Public Workshop for Heavy-Duty Diesel Engines Employing Selective Catalyst Reduction Technology, 75 Fed. Reg. 39,251 (July 8, 2010) (Ex. T hereto).

79.     At the workshop and in subsequent comments, Navistar and various environmental groups and federal and state legislators presented evidence and arguments

demonstrating the inherent ineffectiveness of liquid, urea-based SCR as an emission control technology, and the need for significant revisions in certification requirements for SCR-equipped engines to prevent relaxation of the 0.20 g NOx Standard.

80.     Among other things, and as also noted above in Paragraphs 60-61, EPA received evidence from Navistar detailing the results of EnSIGHT's testing, showing that trucks with 2010-certified, SCR-equipped engines were illegally programmed to operate with their SCR emissions control system turned off for extended periods of time over and over again for their 15-20 year life cycle. Navistar also presented evidence that SCR engine manufacturers had programmed their engines to "burn dirtier," emitting increased levels of NOx in order to achieve commercially attractive fuel efficiency by relying on the SCR aftertreatment (when it works) to remove the excess NOx from the exhaust. As noted above in Paragraph 57, the testing showed that NOx tailpipe emissions from such vehicles were up to **40 times higher** than when the SCR system was operating as intended.

81.     Navistar demonstrated that when these SCR-equipped vehicles operate with their emission control systems turned off, such vehicles are exceeding not only the stringent new 2010 NOx standard but the prior 2009 standard as well.

82.     EPA has acknowledged the severe highway problems created by its 2009 "guidances" and has acknowledged that changes needed to be made to correct the MY 2010 allowances that permit SCR to be a heavy-highway polluter.

83.     The Administrator has determined that MY 2010 SCR-equipped vehicles, although properly maintained and used, do not conform to the regulations prescribed under CAA § 202, 42 U.S.C. § 7521, when in actual use throughout their useful life.

## STANDING

84.     Navistar re-alleges and incorporates by reference the allegations contained in Paragraphs 1 through 83, as if set forth fully herein.

85.     Navistar is a "person" within the meaning of CAA § 302(e), 42 U.S.C.
§ 7602(e), who may commence a civil action under CAA § 304(a), 42 U.S.C. § 7604(a).

86.     EPA sets standards for emissions of NOx from heavy-duty diesel engines.
Navistar, a manufacturer of heavy-duty diesel engines and vehicles, is subject to those
standards.

87.     All of Navistar's MY 2010 diesel engines are subject to the 0.20 g NOx
Standard set by EPA in the 2001 Rule.

88.     Based on information and belief, other than Navistar, all heavy-duty diesel
engine manufacturers that certified heavy-duty diesel engines in vehicles over 14,000 pounds
gross vehicle weight for MY 2010 used liquid, urea-based SCR.

89.     For MY 2010, Navistar used a technology to control emissions inside the
engine (an "in-cylinder" technology), which is called exhaust gas recirculation ("EGR").
EPA requires that Navistar's EGR engines comply with their certificates of conformity and
the 0.20 g NOx Standard.

90.     EPA has repeatedly stated that its standards are "performance" standards,
meaning that the task for the engine maker is to meet the standard with whatever technology
it chooses, and EPA does **not** select any particular emission control technology.  The
Administrator's failure to exercise her non-discretionary duty to recall and require the repair
of non-complying MY 2010 SCR-equipped engines directly harms Navistar, because her
failure preferentially allows SCR engine manufactures to avoid the CAA and applicable EPA
regulations.

91.     That preferential treatment is unfair to Navistar, who does not use liquid, urea-
based SCR technology, but followed and relied on EPA's 2001 mandate to the industry to
build clean-burning engines.  Navistar has invested in advanced technology to comply with
that mandate, while EPA has unlawfully relaxed liquid, urea-based SCR requirements for

Navistar's competitors, including EPA's decision not to recall SCR-equipped engines that do not comply with their certificates of conformity. EPA has turned a willful blind-eye to SCR non-compliance.

92.     EPA has spared the SCR engine makers the substantial investment that they would have had to make to comply with the law. A favorable decision in this case will redress that injury. For example, the Administrator's failure to recall and, thus, enforce the statutory and regulatory requirements against MY 2010 SCR-equipped engines that "do not conform to the regulations prescribed under section 7521" (42 U.S.C. § 7541(c)(1)), preferentially (and illegally) relaxes the 0.20 g NOx Standard solely for liquid, urea-based, MY 2010 (and later model year) SCR engines.

93.     By failing to exercise her non-discretionary duty to recall, the Administrator allowed SCR engines to be certified at one standard for testing in the controlled laboratory setting where certification testing is performed, and is now allowing those engines to exceed the legal standard on the highway by turning off the SCR control system for indefinite periods of time. By contrast, Navistar's EGR system is held to the same strict compliance on the highway as in the testing laboratory.

94.     The Administrator's failure to act (which is unlawfully allowing MY 2010 SCR-equipped trucks to run indefinitely with **zero** SCR-NOx control in violation of the 0.20 g NOx Standard) improperly **lifts** the duly promulgated standard and other regulatory restrictions for SCR engine manufacturers and, therefore, directly harms Navistar by creating an uneven playing field tilted in favor of Navistar's competitors.

95.     Moreover, by allowing non-complying SCR engines to operate on the road, the Administrator and EPA are degrading air quality, which has an adverse impact on Navistar and the breathing public and undermines the investment made by Navistar over the years in clean air in complying with EPA emission standards.

96.     EPA and the United States Court of Appeals for the D.C. Circuit have stated that emissions standards are to be "*technology-forcing*" rather than standards which accommodate current "off-the-shelf" technology. *See, e.g.*, 2001 Rule at 5010; *see also National Petrochemical & Refiners Ass'n v. EPA*, 287 F.3d 1130, 1136 (D.C. Cir. 2002). Notwithstanding the fact that EPA's emission standard is a performance standard and, as such, EPA is prohibited from favoring any particular technology, EPA is giving SCR engine makers preferential treatment and, thus, an unfair and environmentally hostile competitive advantage.

97.     Navistar invested large sums of capital in a clean engine technology in reliance on the mandate of EPA.  SCR engine makers, by contrast, invested in their lobbyists and captured the agency and are being allowed to use cheap, ineffective, old, "off-the-shelf" technology.  SCR engine makers are further being allowed to deploy that technology in a manner that makes it even less effective at NOx emission control by allowing the engine to operate without it turned on.  As a result, EPA and these SCR engine makers are actually degrading air quality when they are supposed to be improving it.

98.     Based on information and belief, EPA accommodated the SCR engine manufacturers through lobbying by their trade association representatives to favor SCR for no environmental purpose, but rather for unlawful anti-competitive reasons – namely, to subsidize SCR engines environmental deficiencies so that the engines could compete against Navistar.

99.     An order requiring the Administrator to perform her non-discretionary duties would correct the asymmetrical application of the 0.20 g NOx Standard and redress the resulting competitive injury inflicted by such inaction on Navistar.

100.    Navistar has been, and will continue to be injured by the Administrator turning a willful blind-eye to SCR non-compliance with their applicable certificates of conformity.

The Administrator's failure to exercise her non-discretionary duty to recall authorizes urea-based SCR engines to operate in violation of their certifications and, as a result, in violation of the 0.20 g NOx Standard on the highway.  Navistar has a strong competitive interest in ensuring that all manufacturers are required to comply with their certificates of conformity as issued by EPA without preferential compliance breaks being provided for manufacturers relying on any one technology, so that there is a level playing field and the environmental benefits of the 0.20 g NOx Standard are achieved and maintained on the highway.

101.    Navistar has a demonstrated long-standing and continuing commitment to the development and implementation of technologies designed to fully comply with the 0.20 g NOx Standard on the highway and reduce NOx emissions to the maximum extent possible. Navistar is injured by the Administrator's failure to exercise her non-discretionary duty to require the recall and repair of engines that "do not conform to the regulations prescribed under section 7521 . . . when in actual use throughout their useful life."  CAA § 207(c)(1), 42 U.S.C. § 7541(c)(1).

102.    Navistar seeks an order enforcing the CAA and, as a result, an end to preferential relaxation of the regulations for SCR and resulting SCR on-highway pollution. An order requiring the Administrator to enforce SCR certificates of conformity for MY 2010 SCR engines and recall non-conforming engines would redress the injury the Administrator's failure to act is causing Navistar, which alone is required by EPA to comply with the certificates of conformity issued by EPA for its engines.

## CLAIM FOR RELIEF

### (Failure To Perform Non-Discretionary Act Or Duty)

103.    Navistar re-alleges and incorporates by reference the allegations contained in Paragraphs 1 through 102, as if set forth fully herein.

23

104. Based on information and belief, the Administrator has determined pursuant to CAA § 207(c)(1), 42 U.S.C. § 7541(c)(1), that a "substantial number" of a class or category of engines – namely, the certified urea-based SCR fleet – "do not conform to the regulations prescribed under section 7521 of this title, when in actual use throughout their useful life."

105. Although "properly maintained and used," MY 2010 SCR engines do not meet the CAA's and EPA's certification and maintenance interval requirements. Since EPA has authorized and "certified" extended (but not unlimited) operation of SCR engines with empty DEF tanks, DEF tanks containing tap water instead of DEF or SCR systems disconnected, such operations cannot be deemed improper maintenance and use.

106. In sum, MY 2010 SCR engines have been manufactured and sold into commerce in violation of their EPA certificates of conformity and approved maintenance interval because they operate without SCR-NOx emission control turned on when trucks are driven in urban areas or in congested traffic and are programmed to operate well-past the mile/hour limits in their certificates of conformity (indeed, indefinitely) with the SCR emission control system disabled.

107. Moreover, in violation of their certificates, such engines are not programmed with "inducements" that function and/or are effective to force the operator to replenish DEF or take the engine out of service.

108. The engine's programming is defective and is not designed to required specifications. Emissions testing demonstrates that 100% of the tested MY 2010 SCR vehicles, when in actual use, do not conform to the regulations under CAA § 202, 42 U.S.C. § 7521, including failing NTE requirements.

109. Under these circumstances, Congress has mandated that, pursuant to CAA § 207(c)(1), 42 U.S.C. § 7541(c)(1), the Administrator "*shall immediately* notify the

manufacturer, and [s]he *shall require* the manufacturer to submit a plan for remedying the nonconformity."

110.    The Administrator has not required the recall and repair of MY 2010 SCR-equipped engines. And, based on information and belief, the Administrator has no intent to do so.

111.    The Administrator's failure to recall and require the repair of urea-based SCR-equipped engines certified for MY 2010 constitutes a "failure of the Administrator to perform any act or duty under this chapter which is not discretionary with the Administrator" within the meaning of CAA § 304(a)(2), 42 U.S.C. § 7604(a)(2).

## PRAYER FOR RELIEF

WHEREFORE, Navistar respectfully prays that this Court:

A.    Declare that the Administrator's failure to recall and remedy all of the deficiencies set for the above in MY 2010 SCR-equipped engines under CAA § 207(c)(1), 42 U.S.C. § 7541(c)(1), constitutes a failure to perform an act or duty (or acts or duties) that is not discretionary with the Administrator within the meaning of CAA § 304(a)(2), 42 U.S.C. § 7604(a)(2).

B.    Order the Administrator to recall and remedy all of the deficiencies set forth above in MY 2010 SCR-equipped engines in accordance with CAA § 207(c)(1), 42 U.S.C. § 7541(c)(1).

C.    Retain jurisdiction of this action to ensure compliance with its decree.

D.    Award Navistar its costs of litigation, including reasonable attorney and expert witness fees, pursuant to CAA § 304(d), 42 U.S.C. § 7604(d).

E.    Grant such further and additional relief as the Court may deem just and proper.

Dated: April 21, 2011                          Respectfully submitted,

                                               _Kyle R. Jefcoat_ (signature)
                                               _____
                                               Kyle R. Jefcoat (D.C. Bar No. 492380)


                                               Laurence H. Levine *(Pro Hac Vice* Motion filed)
                                               LAURENCE H. LEVINE LAW OFFICES
                                               190 South LaSalle Street, Suite 3120
                                               Chicago, IL 60603
                                               Phone: (312) 291-7010
                                               Fax: (312) 291-7005
                                               *laurence.levine@lhlevine.com*

                                               Kyle R. Jefcoat (D.C. Bar No. 492380)
                                               LATHAM & WATKINS, LLP
                                               555 Eleventh Street, N.W.
                                               Suite 1000
                                               Washington D.C. 20004-1304
                                               Phone: (202) 637-2200
                                               Fax: (202) 637-2201
                                               *Kyle.Jefcoat@lw.com*

                                               *Attorneys for Plaintiff Navistar, Inc.*